Richard J. DEZURA

v.

The FIRESTONE TIRE & RUBBER COMPANY and Local Union No. 336, United Rubber, Cork, Linoleum and Plastic Workers of America.

Civ. A. No. 77–1833.

United States District Court,
E. D. Pennsylvania.

April 20, 1979.

Alan F. Markovitz, Philadelphia, Pa., for plaintiff.

Martin Wald, Philadelphia, Pa., for Firestone.

Ira Silverstein, Philadelphia, Pa., for Local Union 336.

1. Plaintiff gave the following testimony during depositions.

    Q. Mr. Jones (union official) argued on your behalf?

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

On February 26, 1976, defendant Firestone Tire & Rubber Company (Firestone) discharged plaintiff, an employee and member of defendant Union Local No. 336, United Rubber, Cork, Linoleum and Plastic Workers of America (Union), upon finding that two days earlier plaintiff had sabotaged company property by placing a foreign object on a rubber strip which fed into a machine used to manufacture tire treads. Following investigation into the incident, the Union decided to reject plaintiff's request for arbitration of the grievance protesting his discharge. Plaintiff then brought this action under Sections 301 and 303 of the Labor Management Relations Act of 1947, 29 U.S.C. §§ 185, 187, and alleged that the Union violated its duty of fair representation, that Firestone wrongfully discharged plaintiff and, acting in concert with the Union, harassed plaintiff and "engaged in numerous acts designed to result in termination of Plaintiff's employment . . ." Firestone and the Union now move for summary judgment.

Initially, Firestone and the Union held two meetings to discuss the matter and learned that another Firestone employee actually saw plaintiff place something on the conveyor belt feeding into the tread tuber. Firestone demonstrated that the object could not have fallen onto the belt before the rubber reached the place where plaintiff was seen. Plaintiff admitted that he was in this area at the time of the incident and that he and the operator of the tread tuber in question disliked each other intensely. To persuade Firestone to reinstate plaintiff, the Union raised various arguments.[1] Firestone, adamant, refused to continue plaintiff's employment on any basis.

    A. To a degree, yes.

    Q. Now, Mr. Jones gave explanations as to how these objects might have gotten there; is that correct?

The Union and Firestone did not discuss the matter again until October 26, 1976, because the entire plant was out on strike from April 20 through August 31, 1976, during which time the Union processed no grievances. At the October meeting the Union made a final attempt to rescue plaintiff, but Firestone again refused. Subsequently, the Union Negotiating Committee met, considered the merits of plaintiff's grievance and refused to recommend that it be taken to arbitration. In January 1977 the Union Executive Board adopted this recommendation and the general membership of the Union did likewise.

Plaintiff then instituted this action and alleged generally that the Union acted capriciously, arbitrarily and in bad faith by failing to process plaintiff's grievance to arbitration. Specifically, plaintiff complains that the Union never contacted plaintiff to advise him that the Union was acting on his grievance; the Union never interviewed witnesses or discussed the merits of plaintiff's claim with him; the Union's investigation was at best "perfunctory" and "incomplete"; the Union never afforded plaintiff an opportunity to present exculpatory evidence. Against Firestone plaintiff alleged that his discharge was retribution for his off-premises sales of competitors' tires during non-working hours, the filing of an EEOC complaint against Firestone by plaintiff's wife, also a Firestone employee, and plaintiff's "intercession on behalf of co-workers in connection with the exercise of rights of employees under the Collective Bargaining Agreement". Firestone and the Union defend that plaintiff has failed to exhaust internal union remedies and that the Union did not breach its duty of fair representation.

.    .    .    .    .

A. Well, yes. He offered to produce witnesses, operators, to testify to the fact that it is not uncommon for such objects to be found in the rubber tubing.

.    .    .    .    .

Q. And?
A. And the company refused to let the witnesses—let Bertram Jones produce the witnesses.
Q. Did anything else happen at this meeting? Did Jones say anything else?
A. Bertram Jones attempted to not have me terminated . . . He tried to get the termination commuted to 60 days, I believe it was.

.    .    .    .    .

Q. And the union, on your behalf, asked that you not be terminated?
A. Correct.
Q. Did they say anything else on your behalf?
A. They offered to produce witnesses to testify as to how often die cuts might get in and how die cuts might get into the tuber and where they might come from, that they don't only come through mills. They come from other sources other than what I'm being accused of. And Mr. Hess (Firestone official) refused Mr. Jones' request to bring Kenny Girth (Firestone employee) or any other operator that had operated it for any length of time that could testify to that.

.    .    .    .    .

Q. Did the union say anything else at this meeting?
A. I believe Mr. Jones tried to have the termination reduced to some length of time being—
Q. Some kind of suspension?
A. Suspension.

.    .    .    .    .

A. I said I saw someone walking from behind my tuber when I saw it.
Q. Who did you tell? You never told the union that, did you?
A. I never had a chance to tell the union.
Q. You expect the union to investigate that when you did not tell them?

.    .    .    .    .

Q. Did you ever attempt to find the man behind this tuber?
A. Maybe someone else saw him.
Q. Is that why they should have talked to this crew, to find this man?
A. It's not the crew. It's the rest of the department they should have talked to.
Q. How many people is that?
A. I don't know how many people are in the department, 10, 20, 30.
Q. They should have talked to 30 people?

.    .    .    .    .

Jones, the union representative, testified regarding the union's efforts on plaintiff's behalf.

.    .    .    .    .

Q. After that meeting what was the next contact that you had with the particular incident, if you recall?

.    .    .    .    .

A. Well, the next day I took Wentzel and Irving Michaels and Steve Rudick (union people) down to the tread tuber where the company alleged that he (plaintiff) had done this. I went and investigated. That is what the two day cooling off period is for, so both parties can go and investigate and come back two days later and present your arguments.

Generally, a union member charging unfair representation must exhaust available internal union remedies prior to filing suit against the union. *Brady v. Trans World Airlines*, 401 F.2d 87 (3d Cir. 1968), *cert. denied*, 393 U.S. 1048, 89 S.Ct. 681, 684, 21 L.Ed.2d 691 (1969); *Hubicki v. ACF Industries, Inc.*, 484 F.2d 519 (3d Cir. 1973). Of course, under extraordinary circumstances or where exhaustion would be futile, this requirement is excused. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Aldridge v. Ludwig-Honold Manufacturing Company*, 385 F.Supp. 695 (E.D.Pa.1974), *aff'd*, 517 F.2d 1397 (3d Cir.), *cert. denied*, 423 U.S. 937, 96 S.Ct. 298, 46 L.Ed.2d 270 (1975). Plaintiff admits that he did not utilize these remedies despite his contractual obligation as a union member to do so. *Vaca v. Sipes, supra; Aldridge v. Ludwig-Honold Manufacturing Company, supra.* Instead plaintiff impugns both the adequacy and availability of the internal union appeals procedure. Plaintiff suggests that his ignorance of the Union's appeal procedure renders it unavailable. Ignorance, however, is no excuse, for plaintiff had a duty to acquaint himself with the nature and availability of union remedies. He was certainly not " 'justified in remaining in ignorance of the provisions governing his own union or, in fact, of relying on a statement by an officer that there was nothing he could do.' " *Aldridge v. Ludwig-Honold Manufacturing Company, supra*, at 698, citing *Newgent v. Modine Manufacturing Company*, 495 F.2d 919, 927–28 (7th Cir. 1974), citing *Donahue v. Acme Markets, Inc.*, 54 L.C. para. 11, 413 (E.D.Pa. 1966). This principle also defeats plaintiff's contention that the Union president's remarks [2] permitted plaintiff to disregard the appeal procedure.

Plaintiff also suggests that Local 336's inability to reinstate plaintiff or to award him backpay renders his internal union remedies inadequate. However, plaintiff has offered no evidence that the International Union could not reverse the local union decision and force the local union to take plaintiff's grievance to arbitration. If the international union wields such power, then plaintiff does indeed have an adequate remedy. Furthermore, plaintiff asserts that the lack of a time limit governing the international and local unions' decision-making processes makes the Union's internal remedies nugatory. Plaintiff cites no examples in which this appeal procedure consumed an inordinate or unfair amount of time. True, in the case at bar the local union did not consider plaintiff's case until eleven months after his discharge. However, for five of these months the entire plant was on strike and the Union acted upon no grievances whatsoever. Unsupported by evidence, the bare allegation that resort to appeal procedures could *possibly* entail years of further delay cannot justify plaintiff's failure to act. *See Ditzler v. International Ass'n of Machinists and Aerospace Workers Local Lodge No. 1984*, 453 F.Supp. 50 (E.D.Pa.1978).

Plaintiff's penultimate argument, that the history of hostility demonstrated by the Union toward the plaintiff throughout his employment with Firestone abrogates his duty to exhaust internal union remedies, requires scant attention. Even assuming that this allegation is true, animus by the local union cannot be imputed to the international body. Plaintiff never gave the international union an opportunity to hear or act upon his grievance. Nor has plaintiff alleged or offered any direct evidence of such hostility by the international union.

Finally, plaintiff alludes to a conspiracy between Firestone and the Union to terminate plaintiff's employment by Firestone's harassment on account of plaintiff's tire sales and his wife's EEOC complaint and by the Union's refusal to process grievances presented by plaintiff. However, none of plaintiff's allegations withstand scrutiny. Even if true, on the face of all

---

**2.** The Union president supposedly told plaintiff that "as far as the local union was concerned, it was over and done and finished".

three either Firestone *or* the Union alone is culpable. Moreover, their veracity *vel non* is simply irrelevant to the instant issue of whether plaintiff has exhausted his internal union remedies. Merely alleging a conspiracy between the employer and union will not counterbalance the strong federal policy of judicial deference to a labor organization's prior opportunity to resolve internal disputes. In sum, none of plaintiff's contentions adequately excuse his failure to exhaust internal union remedies. Since the facts concerning plaintiff's failure to appeal the local union's decision not to arbitrate his grievance are not in dispute, the Union's motion for summary judgment will be granted.

The next issue is whether the failure of plaintiff to exhaust his internal union remedies precludes this action against Firestone. Plaintiff's omission may provide his employer with a complete defense. *Vaca v. Sipes, supra*, 386 U.S. at 184, 87 S.Ct. 903. But as this Court noted in *Neipert v. Arthur G. McKee & Company*, 448 F.Supp. 206, 210 (E.D.Pa.1978),

> it cannot be said that an employer should always be provided the defense of exhaustion of internal union remedies, and especially in situations where the intraunion remedies provide for discipline but 'not for vindication and reversal of the allegedly improper decision.

In the case at bar plaintiff has offered no evidence that the International Union lacks power to reverse the local union decision. Furthermore, had plaintiff exhausted his internal union remedies, it might have been shown that the Union did not breach its duty to plaintiff. Under these circumstances, the direct action permitted by *Vaca v. Sipes, supra*, against employer Firestone would not lie. *Neipert v. Arthur G. McKee & Co., supra; Kobielnik v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 470 F.Supp. 125, (E.D.Pa.1979). Accordingly, Firestone's motion for summary judgment will be granted.